**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-3236-WJM-MDB

LAWANDA ERVIN,

      Plaintiff,

v.

THE UNITED STATES OF AMERICA,

      Defendant.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
ENTERED UPON TRIAL ON THE MERITS TO THE COURT**

---

**I. FINDINGS OF FACT**

**A. Ervin's Background**

    1.     Plaintiff Lawanda Ervin ("Ervin") is a veteran of the Army and the National Guard.  Trial Tr. at 260:1–9, 263:13–15.

    2.     Ervin has a history of mental health issues, including depression and anxiety, and had been previously diagnosed with Major Depressive Disorder.  Trial Tr. at 215:1–3.  In 2014, while living in Oklahoma, Ervin was hospitalized for four days due to depression and anxiety.  Trial Tr. at 285:2–12; Trial Ex. Q.

    3.     Ervin was administered contrast dye on two occasions before 2016 without any documented reaction either time.  Trial Tr. at 324:15–326:14; Trial Ex. S; Trial Ex. U.

    4.     In 2016, Ervin was living in Alaska and working for the Veteran's Benefits

Administration, an agency of the Veterans Administration ("VA").  Trial Tr. at 297:4–7, 12–15; ECF No. 48 at 5 ¶ 2.

     5.     In October 2016, Ervin travelled from Alaska to Colorado for an extended work training.  Trial Tr. at 297:12–15, 299:10–11.

**B.  Ervin's October 2016 CT Scan and Exposure to Contrast Dye**

     6.     Ervin arrived at the Eastern Colorado Healthcare System – Denver VA ("ECHS") emergency room ("ER") on October 23, 2016, around noon, complaining of cough, shortness of breath, and chest pains.  Trial Ex. B at 2; Trial Ex. A10 at 5:20–23, 6:13–14, 6:20–23, 7:12–14.

     7.     In addition to other care, Ervin underwent a Pulmonary CT Angiogram to diagnose the cause of her chest pain.  Trial Tr. at 300:18–21; Trial Ex. D at 1; Trial Ex. A10 at 6:15–7:22; ECF No. 48 at 6 ¶ 5.

     8.     During the CT Angiogram, Ervin was administered intravenous contrast dye.  Trial Ex. D at 1; Trial Ex. A10 at 8:13–15.

     9.     Physicians administer contrast dye during diagnostic procedures to assist them with visualizing internal physiological systems via radiologic imaging and to allow them to take pictures of internal blood vessels.  Trial Tr. at 107:21–23, 142:14–21.

     10.     The particular dye administered to Ervin during her CT Angiogram was Ultravist 370.  Trial Ex. D at 1; Trial Tr. at 651:18–21.

     11.     While undergoing the scan, Ervin did not experience any documented reactions.  Trial Ex. D; Trial Ex. A10 at 7:23–8:3.

     12.     As a result of the scan, Ervin was diagnosed with a small pulmonary

embolism and was prescribed Warfarin, a blood thinning medication.  Trial Ex. D at 2; Trial Tr. at 114:10–16, 122:9–12, 302:23–25, 506:15–17.

13.     Approximately thirty minutes after the CT scan, back in the recovery room, Ervin complained to nurse Robert Kinsman ("Kinsman") that she felt like she was "itching on the inside."  Trial Tr. at 300:25–301:1; Trial Ex. C at 1; Trial Ex. A10 at 7:23–8:1.

14.     Kinsman recorded Ervin's self-reported "itching on the inside," but had not heard any other patient make this complaint before.  Trial Ex. A10 at 10:4–10, 11:20–24, 12:10–12, 13:9–18.

15.     Kinsman also recorded that he did not observe any shortness of breath or anaphylaxis.  Trial Ex. C at 1; Trial Ex. A10 at 10:4-10.

16.     Kinsman and other VA personnel did not document Ervin experiencing or complaining of any other physiological manifestations of an allergic reaction, such as hives, shortness of breath, swelling, dizziness, nausea, anaphylaxis, or a drop in blood pressure.  *See* Trial Ex. C; Trial Ex. A10 at 10:4-10, 11:20-12:6.  Kinsman testified that had he observed Ervin experiencing hives, he would have recorded that in the medical records.  Trial Ex. A10 at 12:13-21.  The attending ER physician ordered 50 mg Intravenous ("IV") Benadryl (an antihistamine) for Ervin, which Kinsman administered.  Trial Ex. B at 1; Trial Ex. A10 at 7:25–8:10.

17.     Ervin was also given 4 mg of Zofran, an anti-nausea medication.  Trial Ex. B at 1; Trial Ex. A10 at 8:3-19.

18.     Kinsman did not document that Ervin had complained of nausea, but

because nausea is a common side effect of contrast dye, Zofran was administered as a precaution.  Trial Ex. A10 at 8:11–19, 15:3–24; *see also* Trial Ex. C.

19.     Finally, Ervin was also given one liter of saline intravenously.  Trial Ex. B at 1; Trial Ex. A10 at 9:2–10:3.

20.     Kinsman testified that saline is a typical post-contrast treatment that is intended to help flush the dye from the kidneys.  Trial Ex. A10 at 9:12–10:3.

21.     It was standard procedure at the VA for all patients receiving contrast dye to be given saline afterward to minimize the potential for kidney damage.  Trial Ex. A10 at 9:14–10:3, 25:5-9; Trial Tr. at 658:23–659:9.

22.     Ervin's symptoms passed within five minutes of receiving 50 mg of IV Benadryl.  Trial Ex. C at 1; Trial Ex. A10 at 8:23–9:2.

23.     Kinsman documented Ervin's reaction to the contrast dye in her chart, and the reaction was entered into the VA's electronic medical records system as an allergy. Trial Ex. C at 2; Trial Ex. A10 at 12:22–13:8.

24.     In the allergy note, Kinsman documented "urticaria" as a symptom Ervin experienced.  Trial Ex. C at 2.  The technical medical definition of "urticaria" is red, raised hives.  Trial Tr. at 625:17-18, 691:15–17.  Multiple witnesses testified, however, that medical providers frequently use the term "urticaria" to refer to any itching.  Trial Tr. at 148:17–25, 354:8–9, 507:20–24.  Kinsman's testimony made clear that in using that term, he was referring to her self-reported itching, not to any visible skin reaction like hives.  Trial Ex. A10 at 13:9–18.

25.     Kinsman documented Ervin's reaction as "mild."  Trial Ex. C at 2; Trial Ex.

A10 at 13:19–14:16. This categorization was because she did not present any outward signs of a reaction, and because her subjective complaint was in the nature of mild discomfort.  Trial Ex. A10 at 14:1–16.

26.     Ervin's expert cardiologist, Dr. Richard Konstance[1] ("Dr. Konstance"), initially described her October 2016 reaction as "mild to moderate."  Trial Tr. 407:22–24. But on cross Dr. Konstance agreed that based on the symptoms documented in Ervin's medical records, the reaction is properly categorized as "mild."  Trial Tr. at 429:19–22.

27.     Ervin testified at trial about her October 2016 reaction.  Her testimony differed from the medical records and Kinsman's testimony.  She testified that after the CT scan, in addition to feeling itching on the inside, her shortness of breath worsened, and she developed red hives on her chest.  Trial Tr. at 300:22–301:2.  She testified that her symptoms did not subside until 10–20 minutes after the administration of Benadryl. Trial Tr. at 301:13–16.  This testimony is not consistent with the medical records or Kinsman's testimony regarding the incident.  The Court finds that the medical records and Kinsman's testimony accurately reflect Ervin's October reaction symptoms.

---

[1] Separately from the content of Dr. Konstance's testimony, the Court notes his shocking conduct during trial, particularly several rude comments to the Court's staff.  While at least one rude comment he made to the undersigned's Courtroom Deputy was prior to going on the record, one comment he made during his sworn testimony is forever memorialized in the transcript prepared by the Court Reporter.  At one point during his testimony, *critical* to Ervin's claim, it became difficult to understand him due to his loud breathing into his microphone.  When he was politely informed of this he responded tersely, "Listen, listen, technology is what it is.  You guys are providing me with the best you can; I'm doing the best I can.  I'll hold my breath in between questions; is that good?"  Trial Tr. 417:14–23.

No one in the courtroom—and probably least of all Ervin, whose claim depends on Dr. Konstance's testimony—appreciated his antics.  The undersigned suggests that if Dr. Konstance is reading this, and if he is fortunate enough to be hired as an expert in another action, he consider more respectful conduct during future testimony.

28.     Ervin was discharged from the ER on October 23, 2016, at approximately 4:20 pm.  Trial Ex. B at 8; Trial Ex. A10 at 7:16–22.

**C.  Ervin Returns to the ER on November 9, 2016, and Is Admitted to the Hospital**

29.     On November 9, 2016, about two weeks after her October ER visit, Ervin returned to the VA ER due to continued difficulty breathing.  Trial Ex. E; Trial Tr. at 304:1–6.

30.     Later that day, Ervin underwent a stress test (or exercise treadmill test), which involved running on a treadmill while her heart function was monitored.  Trial Ex. F; Trial Tr. at 51:9–12, 109:12–110:12.

31.     The stress test was stopped early because it caused Ervin to experience chest pain.  Trial Ex. F; Trial Tr. at 111:14-112:17.

32.     The results of the stress test were interpreted by Dr. Clifford Greyson ("Dr. Greyson"), an attending cardiologist and employee of the VA.  Trial Ex. F; Trial Tr. at 111:14–112:17.

33.     Dr. Greyson has been a cardiologist for nearly 30 years.  Trial Ex. 14.  Dr. Greyson went to medical school at Stanford University.  *Id.*  He was an intern, resident, and critical care fellow at Stanford University Hospital.  *Id.*  He then served as a research fellow and clinical cardiology fellow at the University of California.  *Id.*  Dr. Greyson became an attending physician at the VA in 1995.  *Id.*  He is board certified in internal medicine, critical care medicine, and cardiology.  Trial Tr. 103:6–16.

34.     Because Dr. Greyson discerned abnormal results in Ervin's stress test, she was admitted to the hospital for further diagnostic testing.  Trial Ex. F at 1; Trial Tr.

at 111:14–112:17.  Dr. Greyson concluded that the prudent course was to perform a coronary angiography on Ervin.  Trial Tr. at 112:18–24.  A coronary angiography is a type of cardiac catheterization, which is a type of procedure where a small incision is made in an artery in the arm, neck, or groin and then a catheter is threaded through the artery into the heart.  Trial Tr. 107:6–25.

35.     The purpose of the catheterization for Ervin was to diagnose whether her ongoing chest pain signified any cardiac damage or dysfunction.  Trial Tr. at 112:15–24.

36.     Ervin was still taking oral blood thinners for her embolism diagnosed about two weeks before during her visit to the ER.  Trial Tr. at 114:14–16.  She could not undergo a catheterization while on oral blood thinners.  Trial Tr. at 114:10–115:7.

37.     The catheterization procedure was therefore scheduled for five days later, on Monday, November 14, 2016.  Trial Ex. H at 3; Trial Tr. at 115:8–19.

38.     Ervin was admitted to the VA hospital and remained there from November 9 through November 14, 2016 while she was tapered off oral blood thinners.  Trial Tr. at 114:25–115:7.

39.     In the days between her October embolism diagnosis and her November catheterization, Ervin experienced significant anxiety—on November 9, she told a VA physician that she was "very anxious" about her embolism diagnosis, and that she "stays awake at night worrying that she might die in her sleep."  Trial Ex. E at 1.

**D.  Ervin Has a Cardiac Catheterization Procedure on November 14, 2016**

40.     On November 14, 2016, at approximately 7:49 am, Dr. Kundai Tanganyika—an interventional cardiology resident—reviewed an informed consent form

for the catheterization procedure with Ervin and Ervin signed it.  Trial Ex. I at 6; Trial Tr. at 551:23–24, 554:9–555:5.  The informed consent form explained that one of the known risks of the procedure was "lowering of blood pressure."  Trial Ex. I at 3; Trial Tr. at 555:15–556:1.  Another known risk explained in the informed consent form was "[r]eactions to dye used for imaging."  Trial Ex. I at 3.  "These may include hives, swelling of the face and/or throat, difficulty breathing, and kidney failure."  Trial Ex. I at 3; Trial Tr. at 556:2–14.

41.     Dr. Greyson was the attending physician for Ervin's catheterization.  Trial Tr. at 116:20–22.  He was responsible for the treatment decisions made and for performing the catheterization procedure itself.  Trial Tr. at 116:20–22.

42.     Prior to the catheterization procedure, Dr. Greyson discussed Ervin's medical history, including her prior contrast dye reaction, with the inpatient cardiology fellow, Dr. Erin McGuinn.  Trial Tr. at 119:11–19.

43.     Dr. Greyson knew that, as the inpatient cardiology fellow, Dr. McGuinn would have knowledge of Ervin's cardiovascular and medical history.  Trial Tr. at 118:16–20.

44.     Dr. McGuinn and Dr. Greyson had a conversation about Ervin's prior history, including the nature and severity of her prior contrast dye reaction.  Trial Tr. at 119:11–122:8.

45.     Because Ervin's October reaction had been mild and was alleviated quickly through application of 50 mg of IV Benadryl, Dr. Greyson determined that the appropriate pretreatment for her exposure to contrast dye in the catheterization was to

administer the same 50 mg of IV Benadryl.  Trial Tr. at 121:16–122:8, 123:16–124:3,
127:18–128:6, 129:16–130:17.

46.     At 2:10 p.m. on November 14, per Dr. Greyson's order, Ervin was given
an IV of 50 mg of diphenhydramine (the generic name for Benadryl).  Trial Ex. L at 19;
Trial Tr. at 509:20-511:4.  The administration time was indicated by a notation in the
handwritten log of nurse Michael Panagos ("Panagos"), the sedating nurse responsible
for administering the medications and recording when they were given.  Trial Tr. at
510:14–511:5; Trial Ex. L at 19.

47.     Dr. Greyson was aware that Ervin could be pretreated with a more
aggressive regimen including a 13-hour course of steroids.  Trial Tr. at 131:9–14.
However, he believed steroid pretreatment was not necessary, given the mildness of
her October reaction, the low likelihood of a reaction recurring, and the high likelihood
that a recurrent reaction would be similar in severity to the October reaction, and thus
easily treatable in the lab.  Trial Tr. 131:9–14, 128:13–130:17.  Dr. Greyson therefore
decided not to pretreat Ervin with steroids.  Trial Tr. 131:9–14.

48.     At 2:24 and 2:28 pm, Ervin was given an IV with 0.5 mg of Versed and 25
mcg of Fentanyl to moderately sedate her for the procedure.  Trial Ex. L at 4–5, 19; Trial
Tr. at 149:5–25, 512:5–18.

49.     Versed and Fentanyl can have significant effects on a patient's perception
and recollection of a procedure—patients can form memories of the procedure that are
entirely inaccurate and have been known to report things that did not happen.  Trial Tr.
at 150:1–24, 437:24–439:12, 512:15–18.

50.     The records do not memorialize precisely when contrast dye was first administered to Ervin, but it was likely shortly before the first recorded treatment of what was suspected to be a contrast reaction—administration of saline—at 2:40 p.m.  Trial Tr. at 154:15–155:16, 515:14–516:12; Trial Ex. L at 20.  Thus, Ervin received the IV Benadryl approximately (but less than) 30 minutes before the administration of the contrast dye.  Trial Tr. at 510:14–511:15, 515:14–516:12; Trial Ex. L at 19–20.

51.     Dr. Greyson also used a different contrast dye agent than the one Ervin was administered in October.  Trial Ex. L at 1; Trial Tr. at 664:21–665:3.  He used Visipaque, a brand of the generic dye iodixanol, which is different than the Ultravist that had been used in October.[2]  *Compare* Trial Ex. L at 1, *with* Trial Ex. D at 1; Trial Tr. at 131:7–8, 664:21–665:3.

52.     During the catheterization, Ervin's blood pressure was monitored by an automated blood-pressure cuff on her arm as well as a blood-pressure monitor on the tip of the catheter itself.  Trial Tr. at 94:1–5, 151:8–15, 152:13–24.

53.     During the procedure, the internal catheter reported a drop in Ervin's blood pressure (hypotension).  Trial Tr. at 156:4–161:2; Trial Ex. L at 20.  The arm cuff did not record a corresponding drop in blood pressure.  Trial Tr. at 156:16–20, 160:21–161:2; Trial Ex. L at 4–6.

54.     Dr. Greyson instructed his team to call a "code blue."  Trial Ex. L at 5; Trial Tr. at 167:16–169:9.  A "code blue" is a precautionary measure intended to ensure that

_____

[2] Dr. Greyson was not aware of this difference at the time of the procedure.  Trial Tr. at 131:3-6.

additional personnel and resources are available should they become necessary.  Trial Ex. at 167:16–168:17.

55.     Ervin was rapidly administered intravenous saline, epinephrine, and Dopamine to stabilize and raise her blood pressure.  Trial Ex. L at 20; Trial Tr. at 161:3–162:19, 164:16–167:12, 173:17–175:11.  The medications were initially administered through the IV in Ervin's arm, but given the potential urgency of the situation, Dr. Greyson and his team inserted a second IV into Ervin's jugular vein to administer additional doses of medication.  Trial Tr. 166:1–15.

56.     At the same time, Dr. Greyson and his team attempted to determine whether the low blood pressure readings from the catheter were the result of equipment failure rather than reflecting a genuine drop in pressure.  Trial Tr. at 156:16–160:20.  Dr. Greyson was not able to identify any equipment irregularity that would have incorrectly produced the catheter blood pressure readings, however.  Trial Tr. at 160:21–161:2.

57.     Within minutes after treatment was initiated by the team, Ervin's blood pressure readings on the internal catheter returned to the normal range.  Trial Ex. L at 20; Trial Ex. M at 3; Trial Tr. at 175:12-23.

58.     Dr. Greyson cancelled the code blue less than one minute after it had been called.  Trial Ex. L at 5; Trial Tr. at 171:1–12.

59.     Ultimately, Dr. Greyson interpreted the hypotension reflected on the internal blood pressure reading as a reaction to the contrast dye and characterized it as such in his post-procedure note.  Trial Ex. M at 3; Trial Tr. at 98:2–99:24.

60.     Although she was moderately sedated during the procedure, Ervin was

11

aware and responsive throughout.  Trial Tr. at 517:7–518:7.  She did not report any discomfort related to the apparent drop in blood pressure, or any awareness that anything out of the ordinary was happening.  Trial Tr. at 163:2–18; Trial Ex. L at 19–20.  Specifically, Ervin did not complain of or show indications of itching, shortness of breath, sneezing, nausea, or any other physical manifestation of an allergic reaction at any point during the catheterization.  Trial Tr. at 162:20–164:15.  She also did not lose consciousness or report experiencing any physical symptom consistent with a drastic drop in blood pressure.  Trial Tr. at 517:7–518:7.

61.    Nevertheless, Ervin later testified at trial that she was aware that there was an emergency occurring and that her blood pressure was dropping, causing her to fear for her life and believe that her life was endangered during the catheterization. Trial Tr. at 313:6–24.

62.    One of Panagos's duties during the procedure was to record Ervin's level of awareness and emotional state using the "Ramsey sedation scale."  Trial Tr. at 511:6–512:4, 517:7–518:7.  On that scale, a notation of 2 indicates that the patient is "Cooperative Tranquil & Oriented."  Trial Ex. L at 19; Trial Tr. at 511:24–512:1, 518:14–19.  Panagos recorded Ervin's Ramsey scale every five minutes throughout the procedure, and every time he made such an observation, he entered a 2.  Trial Ex. L at 19–20; Trial Tr. at 518:14–19.

63.    The cardiac catheterization procedure was completed without further incident and did not identify any cardiac problem that may have contributed to Ervin's ongoing chest pain.  Trial Ex. M at 3; Trial Tr. at 176:23–178:2.

64.    Ervin's recollection of the procedure does not match the records or the accounts of the other percipient witnesses.  Specifically, she testified that she heard doctors making dramatic pronouncements, such as "We're losing her!" during the procedure.  Trial Tr. at 329:21–330:3.  Based on the testimony of every other percipient witness, the Court is not persuaded that this occurred.  Trial Tr. at 172:6–9, 387:5–8, 519:6–8, 561:21–562:2.  Every other witness testified that the atmosphere in the catheterization lab was focused and professional, and while the providers viewed it as a serious situation, they were calm and quiet throughout.  Trial Tr. at 171:13–172:5, 387:2–8, 518:20–519:5, 561:4–20.

65.    Ervin also testified that a female nurse was holding her hand and rubbing her forehead.  Trial Tr. at 329:15–20.  Ervin testified that the female nurse became agitated and was kicked out of the catheterization lab.  Trial Tr. at 312:19–23, 330:6–15.  Again, based on the testimony of every other percipient witness, none of whom testified they witnessed any such interaction, the Court is not persuaded that this ever occurred.  Trial Tr. at 172:10–16, 388:15–24, 519:16–520:20, 562:22–563:11.

66.    Ervin's final memory of the catheterization procedure was that the doctors needed to "put a catheter in her neck" prior to calling a "code blue."  Trial Tr. 313:3–12.  After she heard the calling of a "code blue," Ervin has no memories until she woke up in the Intensive Care Unit.  Trial Tr. 313:13–16.

67.    Similarly, in 2017, Ervin told medical providers in Alaska that she had suffered a cardiac arrest during the procedure, and she had to be administered CPR, which injured her and may have resulted in a broken rib.  Trial Ex. Z at 4; Trial Ex. A3 at

7; Trial Tr. at 333:18–335:18, 336:3–337:5.  On cross-examination Ervin denied making these statements to these providers.  Trial Tr. at 333:6-337:9.  But she could offer no explanation for how these notations ended up in her medical records.  The Court finds that Ervin gave inconsistent accounts of her catheterization procedure to later providers and was not truthful regarding having done so during her trial testimony.

**E.  Ervin's Recovery from the Catheterization Procedure**

68.     After Dr. Greyson successfully completed the catheterization procedure, Ervin was transferred to the Intensive Care Unit ("ICU") for monitoring overnight.  Trial Ex. M at 3; ECF No. 48 at 6 ¶ 7; Trial Tr. at 176:23–178:2.

69.     The day after the catheterization procedure, Dr. Greyson prepared a post-procedure note recording what had occurred during the catheterization procedure.  Trial Ex. M.  In the recommendations section of that document, he wrote "[u]pdate contrast allergy to anaphylactoid reaction."  Trial Ex. M at 3.  Dr. Greyson explained that it was important to make sure that Ervin's record be updated to include the specifics of her reaction "so that in the future if she were to require another contrast-based procedure, she would be treated prophylactically as if she had had a moderate or severe contrast allergy."  Trial Tr. at 182:4–8.  He wanted to make sure that future providers "would know that she had had a true major contrast reaction."  Trial Tr.at 183:6–7.

70.     After exhibiting no adverse physiological signs or symptoms overnight, Ervin was discharged the next morning, November 15, 2016.  Trial Tr. at 332:15–17, 472:4–20.

71.     Ervin has not identified any *physical* injuries or effects that she has

suffered from the contrast reaction that occurred during her catheterization.  Trial Tr. at 440:11–14.  Properly treated contrast dye reactions are not known to cause any long-term physiological effects.  Trial Tr. at 603:21–604:4.

72.     With respect to *emotional* injuries or effects, Ervin claims that the events during her catheterization procedure caused her to develop Post-Traumatic Stress Disorder ("PTSD").  Trial Tr. at 318:7–14, 321:15–322:19.

73.     In March of 2018, Ervin underwent a placement examination for a position with the Department of Defense assisting service members in South Korea.  *See* Trial Ex. A5; *see also* Trial Tr. at 341:24–342:8.  She told the examiner that at that time, her PTSD symptoms had improved and that she no longer required regular medication to manage her symptoms.  Trial Ex. A5 at 1.  She stated that she would not require any accommodation to perform the work of the South Korea position.  Trial Ex. A5 at 1.  Ervin obtained this position, and her family moved to South Korea in the summer of 2018.  Trial Tr. at 48:13–23.

## F.  Dr. Greyson Met the Standard of Care by Pretreating Ervin with IV Benadryl, and the Standard of Care Did Not Require Dr. Greyson to Give Ervin Steroids

74.     Unlike a true allergic reaction (such as a food allergy), contrast dye reactions are considered pseudo allergic (or anaphylactoid).  Trial Tr. at 593:10–17.  While a true allergy can be expected to recur on every re-exposure, contrast dye reactions recur on re-exposure only around 30% of the time.  Trial Tr. at 592:15–23.

75.     Moreover, where contrast dye reactions do recur, in the vast majority of instances, the second reaction is of similar severity to the first.  Trial Tr. at 592:24–593:9.

76.     Contrast dye-reactions can also be categorized as "physiological" or "allergic-like."  Trial Tr. at 648:10–16.  Physiological reactions consist of flushing, nausea, and a general feeling of being unwell.  Trial Tr. at 648:19–649:8.  Treatment guidelines provide that patients who experience only physiological reactions do not need to be pretreated at all before a later exposure to contrast dye.  Trial Tr. at 650:1–8, 663:13–23.

77.     Ervin's October reaction to contrast dye was mild, and given its mildness, it is not definitively clear whether it was physiological or allergic-like.  Trial Tr. 654:22–655:25.  Either way, she was not properly viewed as at high risk of a recurrent reaction before the November catheterization.  Trial Tr. at 595:3–16, 677:23–25.

78.     The United States presented the expert opinions of Dr. Matthew Holland ("Dr. Holland"), a cardiologist, and Dr. Alan Schocket ("Dr. Schocket"), an allergist/immunologist, regarding the proper standard of care.  According to these experts, the standard of care for a patient who has had a prior allergic reaction allows for a provider to tailor pretreatment decisions to a patient's particular medical history, and where a patient has a mild or questionable prior reaction, it is within the standard of care to use either no premedication before re-exposure or antihistamine-only premedication.  Trial Tr. at 604:9–18, 678:1–17.

79.     Drs. Holland and Schocket both testified that Dr. Greyson's treatment of Ervin's prior allergic reaction met and exceeded the standard of care.  Trial Tr. at 604:9–18, 646:16–21, 678:18–22.

80.     With respect to the timing of the administration of the IV Benadryl, while

some guidelines suggest that Benadryl may be administered up to an hour before injection of contrast dye, this recommendation is for convenience, and typically applies to oral Benadryl.  Trial Tr. at 666:1–14.  IV Benadryl takes effect very quickly.  Trial Tr. at 637:22–638:16, 656:22–657:5; Trial Ex. 24.

81.     Dr. Schocket testified that the symptoms of a contrast reaction are caused when histamine that is released from mast cells bonds to receptor sites in the body. Trial Tr. at 589:12–24, 590:7–591:12.  Benadryl works by also bonding to the receptor sites, competing with the histamine.  Trial Tr. at 595:20–23.  When Benadryl is administered *after* a reaction has already begun, it takes effect more slowly because it must displace the histamine already at the receptor sites.  Trial Tr. at 595:17–596:1, 638:6–13.  But when Benadryl is given *before* a reaction begins, it bonds to the receptor sites first, and thus takes effect more quickly.  Trial Tr. 638:14–16.

82.     Dr. Holland testified that IV Benadryl takes effect "within 60 heartbeats." Trial Tr. at 719:11–13.

83.     At least one study suggests that for patients with a prior mild contrast reaction like Ervin, antihistamine-only pretreatment is the most effective form of pretreatment for exposure to contrast.  Trial Ex. 21 at 1.  This study was published in 2018, but Dr. Greyson testified that it was consistent with his understanding of the standard of care in November 2016.  Trial Tr. at 193:21–194:25.  Dr. Konstance, Ervin's expert, also testified that he was not aware of any changes to the standard of care for pretreatment between November 2016 and the present.  Trial Tr. at 424:11–17.

84.     At least one hospital guideline also provides that patients with a history of

prior mild contrast reactions be given either no pretreatment, or antihistamine-only pretreatment.  Trial Ex. 19 at 2.  This guideline also dates from 2018, but Dr. Greyson testified that it was consistent with his understanding of the standard of care in November 2016.  Trial Tr. at 132:17–133:25.

85.    Using a different contrast dye has been shown to reduce the probability of a contrast dye reaction reoccurring.  Trial Tr. at 663:24–664:7, 716:7–11.

86.    Dr. Holland also testified that medical records are often inaccurate regarding "contrast reactions."  Trial Tr. at 660:2–6.  Dr. Holland pointed to a study that found that chart notations of "contrast allergy" are accurate less than 20% of the time.  Trial Tr. at 660:7–23.  That is, more than 80% of chart notations of prior contrast reactions turned out to be inaccurate.  Trial Tr. at 660:20–24.

87.    As to whether steroids were required, it was not disputed at trial that in high-risk patients with a history of *severe* prior contrast reactions, steroid pretreatment is generally believed to reduce the chance of a recurrent contrast reaction.  Trial Tr. at 602:20–25, 666:22–667:14.  But the question for the Court is whether steroids were required for Ervin.

88.    Plaintiff presented the expert testimony of Dr. Konstance.  Dr. Konstance opined that the standard of care for cardiologists requires that *every* patient with any documented history of any contrast dye reaction of any kind (even mild) must invariably be premedicated with Pepcid, steroids, and antihistamines before re-exposure to contrast dye.  *See* Trial Ex. 13 at 3.

89.    Therefore, Dr. Konstance opined that by not administering both Benadryl

and corticosteroids an hour prior to the procedure, Dr. Greyson fell below the standard of care. Trial Tr. at 409:21–23, 410:2–8.  Dr. Konstance testified that "regardless of the severity of a prior reaction, there's a concern for" a severe reaction in the future, and that those reactions can be mitigated by the administration of Benadryl and steroids. Trial Tr. at 418:12–15.  Dr. Konstance testified that it is his opinion that Dr. Greyson's failure to meet the standard of care caused Ervin to experience a contrast dye reaction. Trial Tr. at 414:1–5.

90.     The evidence was undisputed, however, that steroid pretreatment does not guarantee that a patient will not experience a contrast reaction, because steroids cannot prevent all contrast dye reactions.  Trial Tr. at 132:8–15, 436:6–13, 602:22–603:20, 662:4–663:4.

91.     Dr. Schocket testified that, in contrast to Benadryl, doctors do not have a well-developed understanding of the mechanism whereby steroid pretreatment may reduce the likelihood of a contrast reaction.  Trial Tr. at 602:20–603:20.

92.     Similarly, the precise extent to which steroid pretreatment can reduce the likelihood of a recurrent dye reaction for patients with a history of mild prior reactions is not well studied.  Trial Tr. at 603:4–20.  Some literature suggests a reduction in risk of recurrent reaction of 30%, but those statistics are specific to patients at high risk of a recurrent reaction.  Trial Tr. at 677:3–25; Trial Ex. 39 at 12.

93.     Both Dr. Holland and Dr. Schocket testified that they could not opine to a reasonable degree of medical certainty that had Ervin been pretreated with steroids, her November reaction would not have occurred.  Trial Tr. at 603:15–20, 662:24–663:4.

94.     Steroid pretreatment also has risks.  Trial Tr. at 667:1–14, 668:6–670:10.

95.     Studies have shown that even a single dose of oral steroids can ultimately cause aseptic necrosis of the femoral head later in life, requiring a hip replacement. Trial Tr. at 668:16–669:4.

96.     Because steroids suppress the immune system, administering them unnecessarily can lead to increased incidence of dangerous hospital-acquired infections, particularly for inpatients like Ervin.  Trial Tr. at 669:5–16.

97.     Ervin's diagnosis of a pulmonary embolism meant that administration of steroids could put her at increased risk of deep vein thrombosis and further emboli. Trial Tr. at 669:22–25.

98.     Steroids are also known to cause psychological effects, from increased anxiety to hallucinations and paranoia.  Trial Tr.  at 670:4–10.  Dr. Konstance agreed that steroids can cause "psychiatric reactions."  Trial Tr. at 416:8–9.

99.     A study published in May 2016 concluded that, to prevent 1 death from a severe contrast reaction, 32 deaths would result from overly aggressive steroid pretreatment, at a cost of $131,000,000 for each lethal reaction prevented.  Trial Ex. 25; Trial Tr. at 673:15–19.

100.    Because of the rigor and weight of the scientific evidence presented, the Court gives greater weight to the expert testimony of Dr. Holland and Dr. Schocket on the question of whether steroid premedication was required or recommended for Ervin.

101.    By administering IV Benadryl approximately 30 minutes before the administration of contrast dye, Dr. Greyson met the standard of care for pretreatment of

Ervin's prior mild reaction to contrast dye.  The standard of care did not require more, and more specifically, it did not require the administration of steroid premedication.

102.    Moreover, there is no dispute that Dr. Greyson's response to and treatment of Ervin's hypotension during the catheterization procedure was appropriate and within the standard of care.  Trial Tr. at 440:4–10, 646:12–21.

**G.  Damages**

103.    As economic damages, Ervin requests $22,000.80, which is the stipulated cost of the night she spent in the Intensive Care Unit after the catheterization procedure.  ECF No. 75.

104.    Because her cardiac issues were not considered service-connected, the medical cost attributable to Ervin's overnight stay in the ICU after her November 14, 2016, cardiac catheterization was $22,000.80.  ECF No. 75.

105.    Ervin is not seeking damages for lost income.  ECF No. 48 at 6 ¶ 8.

106.    Ervin requested the statutory maximum amount awardable in noneconomic damages, including pain and suffering and disability.  Trial Tr. at 17:22–25

## II. CONCLUSIONS OF LAW

**A.  Applicable Law**

1.    Federal Tort Claims Act

108.    The Court has jurisdiction over the claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671–80, as well as general federal-question jurisdiction under 28 U.S.C. § 1331.

109.    The FTCA provides for a limited waiver of sovereign immunity for

"personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment[.]"  28 U.S.C.A. § 1346(b)(1); *see also Woodruff v. Covington*, 389 F.3d 1117, 1125–26 (10th Cir. 2004).

110.    The FTCA thus provides a limited waiver of sovereign immunity "making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment."  *Bethel v. United States*, 456 F. App'x 771, 777 (10th Cir. 2012) (quoting *United States v. Orleans*, 425 U.S. 807, 813 (1976)); *see also* 28 U.S.C. § 1346(b) (the government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.").

111.    The duty of the United States in a tort action is defined in accordance with the law of the state where the negligence occurred.  28 U.S.C. § 1346(b)(1).  Because the alleged negligence here occurred in Colorado, the Court applies Colorado law.

112.    The Court has personal jurisdiction over the parties to this action.

113.    Venue is proper in this Court.

114.    A plaintiff suing under the FTCA must first present the tort claim to the appropriate federal agency for possible settlement within two years after the claim accrues.  28 U.S.C. §§ 2401(b), 2675(a).  The United States does not dispute that Ervin timely presented her claim to the proper federal agency, United States Department of Veterans Affairs, within two years after her claim accrued.

115.    A complaint cannot be filed until the administrative claim has been denied

or until six months have passed without the agency acting on the administrative

claim.  28 U.S.C. § 2675(a).  The United States does not dispute that Plaintiff timely

filed her Complaint against the United States after the VA denied Plaintiff's claim.

116.    Plaintiff exhausted her remedies and timely brought her claim against the

proper parties under the FTCA.

2.    <u>Medical Negligence</u>

117.    To establish negligence under Colorado law, a plaintiff must show:

(1) legal duty; (2) breach of that duty; (3) proximate cause; and (4) damages.  *Keller v.*

*Koca*, 111 P.3d 445, 447 (Colo. 2005); *Walcott v. Total Petrol., Inc.*, 964 P.2d 609, 611

(Colo. App. 1998).

118.    In Colorado, "the law implies that a physician employed to treat a patient

contracts with his patient that: (1) he possesses that reasonable degree of learning and

skill which is ordinarily possessed by others of the profession; (2) he will use reasonable

and ordinary care and diligence in the exercise of his skill and the application of his

knowledge to accomplish the purpose for which he is employed; and (3) he will use his

best judgment in the application of his skill in deciding upon the nature of the injury and

the best mode of treatment."  *Day v. Johnson*, 255 P.3d 1064, 1069 (Colo. 2011).  "[I]f a

physician possesses ordinary skill and exercises ordinary care in applying it, he is not

responsible for a mistake of judgment."  *Id.*

**B.  Breach**

119.    There is no dispute in this action that Dr. Greyson, as a VA-employee

physician, owed a duty of care to Ervin, his patient.  *See Greenberg v. Perkins*, 845

P.2d 530, 534 (Colo. 1993) ("If a physician undertakes to treat or otherwise provide medical care to another, he thereby either expressly or impliedly contracts to exercise reasonable and ordinary care and diligence to fulfill that purpose.  In such a circumstance, a physician–patient relationship exists, and the physician's contractual obligations create the matrix from which an independent tort obligation arises.").

120.    The precise contours of that duty—that is, what a physician of ordinary care and diligence would have done under circumstances of this case—is the central dispute between the parties.

121.    "To establish a breach of the duty of care in a medical malpractice action, the plaintiff must show that the defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by the defendant."  *Day*, 255 P.3d at 1069.  "That standard of care is measured by whether a reasonably careful physician of the same school of medicine as the defendant would have acted in the same manner as did the defendant in treating and caring for the patient."  *Id*.  The standard of care in a medical malpractice action "must be established by expert testimony."  *United Blood Servs. v. Quintana*, 827 P.2d 509, 520 (Colo. 1992).

122.    The only expert opinion testimony presented by Ervin regarding a breach of the standard of care was that of Dr. Konstance, a cardiologist.  Dr. Konstance specifically testified that no cardiologist other than Dr. Greyson was responsible for selecting the pretreatment, if any, for Ervin before her catheterization.  Trial Tr. at 437:2–23.  The Court thus finds that the only breach that Ervin may recover for would

be a breach by Dr. Greyson, if any.[3]

123.    The Court concludes, however, that Ervin has not established by a preponderance of the evidence that Dr. Greyson breached his duty of care to her.

124.    The standard of care issue presents the Court with a classic "battle of the experts," in which the Court, as finder of fact, must determine which side's experts to credit.  *See Watson v. United States*, 485 F.3d 1100, 1110 (10th Cir. 2007) ("[M]aking sense of the battle of experts is the essence of most medical malpractice trials.").

125.    As set forth in the Findings of Fact, Plaintiff's expert cardiologist, Dr. Konstance, opined that the standard of care for cardiologists requires that *every* patient with *any* documented history of any contrast dye reaction of any kind must invariably be premedicated with Pepcid, steroids, and antihistamines before re-exposure to contrast dye.  *See* Trial Ex. 13 at 3.  The United States presented the expert opinions of Dr. Holland, a cardiologist, and Dr. Schocket, an allergist/immunologist, to the effect that pretreatment decisions should be tailored to a patient's particular medical history, and where a patient has a mild or questionable prior reaction, it is within the standard of care to use either no premedication before re-exposure, or antihistamine-only premedication, as Dr. Greyson used in this case.  Drs. Holland and Schocket both testified that Dr. Greyson's conduct met and exceeded the standard of care.  For the following reasons, the Court gives greater weight to the testimony of Drs. Holland and Schocket regarding

---

[3] Ervin did not appear at trial to argue that any medical professional other than a cardiologist had breached a duty of care to her.  In any event, because the only expert opinion she presented on breach was that of a cardiologist—who did not opine that any professional other than Dr. Greyson had breached a standard of care—any claims against any other providers have not been supported by expert opinion and are thus not viable.

the appropriate standard of care to apply to the facts of this case.

126.    First, while Dr. Konstance's opinion was categorical, he did not point to any medical literature, studies, or hospital guidelines that were similarly categorical and without exception.  Dr. Konstance testified to no empirical basis for his opinion other than his personal medical training and vague references to "the literature."  Trial Tr. at 418:17–20, 431:19–23.  None of the articles that were admitted into evidence, however, endorse the automatic steroid pretreatment regimen he suggested.  Even the Duke guidelines that Ervin pointed to in the cross-examination of Dr. Holland, *see* Trial Ex. A8 at 8–9, do not suggest pretreatment for all patients with prior reactions, and specifically exempt patients with a prior physiologic reaction from steroid pretreatment.  Trial Tr. at 730:9–733:7.  And the United States presented other hospital guidelines providing that steroid premedication is not recommended for patients with mild allergic-like prior reactions .  Trial Ex. 19 at 2.  The Court concludes, therefore, that Dr. Konstance's one-size-fits-all opinion was not supported by the medical literature.

127.    Second, the opinions of Dr. Holland and Dr. Schocket fit the underlying facts of the action better than the opinion of Dr. Konstance.  If Dr. Konstance were correct, then the specific nature of a prior contrast reaction is not medically significant for future exposures and premedication—only the *fact* of a reaction matters.  But the trial record contains instances in which medical providers recorded not just the fact of a reaction, but its specific manifestation.  Kinsman included a detailed description of Ervin's October reaction so that future providers would understand the nature of what occurred.  Trial Ex. A10 at 13:1–8.  Dr. Greyson testified the same—in his post-

procedure note, he gave the recommendation: "[u]pdate contrast allergy to anaphylactoid reaction."  Trial Ex. M at 3.  His testimony was credible that he did so because it was important to make sure that the allergy note be updated to include the specifics of Ervin's reaction "so that in the future if she were to require another contrast-based procedure, she would be treated prophylactically as if she had had a moderate or severe contrast allergy."  Trial Tr. at 182:4–8.  None of this undisputed evidence is consistent with Dr. Konstance's view that only the fact of a reaction—not its severity or specific manifestation—matters to a future pretreatment decision.

128.    Third, the Court is unwilling to adopt Dr. Konstance's version of the standard of care because Dr. Konstance himself admitted that he does not follow that standard.  In his report, Dr. Konstance opined that Ervin should have been pretreated with a combination of steroids, antihistamines, and Pepcid.  Trial Ex. 13 at 3.  In his direct examination, he omitted Pepcid from his formulation of the standard of care.  Trial Tr. at 409:24–410:3.  On cross-examination, he agreed that the use of Pepcid is no longer "part of the formal guideline," and thus the standard of care.  Trial Tr. at 432:4–6. But he admitted that he continues to use Pepcid in his personal practice "because it's ingrained in [him] from [his] training."  Trial Tr. at 432:7–11.  The fact that Dr. Konstance asks the Court to adopt a standard of care that he himself does not follow argues strongly against the Court giving any meaningful weight to his opinions.

129.    Fourth, the Court is troubled by the consequences of adopting Dr. Konstance's proposed standard of care because doing so would likely lead to an increase in the use of steroids throughout Colorado.  Dr. Holland testified regarding a

27

study that found that 80% of all chart notations of prior contrast allergy are inaccurate, a data point the Court finds especially troubling.  Trial Tr. at 660:20–25.  But adopting Dr. Konstance's standard of care would require that *all* patients with such a notation be premedicated with steroids.  This would result in many patients being given steroids for no medically necessary reason.  Considering Dr. Holland's compelling testimony regarding the risks of steroids—including future joint damage, risk of hospital-acquired infections, and detrimental psychological effects (of particular concern for a patient with acute anxiety issues like Ervin)—the Court is deeply concerned by the prospect of making a ruling regarding standard of care that risks doing more harm than good to Colorado patients.

130.    In contrast, the Court is much persuaded by Dr. Holland and Dr. Schocket, who opined that there is no one-size-fits-all requirement for pretreating patients with a history of contrast-dye reactions.  The Court is persuaded that a physician is required to consider the nature and severity of a patient's prior reaction, as well as to consider the risks and benefits of potential pretreatment regimens, when determining what pretreatment, if any, is appropriate for any particular patient.  For some patients, the aggressive steroid pretreatment endorsed by Dr. Konstance may be appropriate.  For others, and specifically for Ervin, it is within the standard of care to conclude that a different pretreatment regimen—or none—is appropriate.

131.    Here, as described in the Findings of Fact, Ervin's October contrast-dye reaction was mild.  She described only a single symptom—"itching on the inside"—that is ambiguous at best and that providers testified they had never heard any patient

complain of previously.  She did not demonstrate any objective manifestation of an anaphylactoid reaction, such as hives, flushing, difficulty breathing, or a drop in blood pressure.  Her reaction may have been physiological, rather than allergic-like, in which case no pretreatment was necessary at all.  Her only reported symptom resolved completely within five minutes after administration of 50mg of IV Benadryl.  While Ervin testified to more extensive symptoms, the Court is not persuaded by a preponderance of the evidence that these occurred, given the lack of any notation in the medical records.  The Court thus concludes that Ervin's October reaction was properly characterized as mild.

132.    Considering the mild nature of Ervin's October reaction, the Court concludes that it was reasonable for Dr. Greyson to decide that a steroid-based pretreatment regimen was not necessary.  Dr. Schocket testified that contrast-dye reactions can only be expected to recur 30% of the time as a baseline, and that when a patient experiences a recurrence, the vast majority of the time the second reaction is similar in severity to the first.  Based on this testimony, in the Court's view, Dr. Greyson would have been within the standard of care if he had chosen not to pretreat Ervin at all, but the fact that he did pretreat her with Benadryl was further evidence of his superior experience, prudence, logic, and exercise of more than reasonable medical judgment.

133.    As to the specific pretreatment Dr. Greyson chose, the Court concludes that, again based on the testimony of Dr. Schocket regarding the expected severity of recurrences, pretreating Ervin with the same dosage and type of Benadryl that resolved her October reaction was reasonable and within the standard of care.

134.   In sum, the Court easily concludes that Ervin has failed to establish by a preponderance of the evidence that Dr. Greyson breached the applicable medical standard of care.

## C. Causation

135.   "The test for causation is the 'but for' test—whether, but for the alleged negligence, the harm would not have occurred."  *Smith v. State Comp. Ins. Fund*, 749 P.2d 462, 464 (Colo. App. 1987).  This test is satisfied only when a defendant's conduct "in a natural and continued sequence, unbroken by an efficient, intervening cause, produces the results complained of, and without which that result would not have occurred."  *Id.*  A plaintiff also must show that negligence was a substantial factor in producing the harm.  *Id.*; *see also* Restatement (Second) of Torts §§ 431–33 (1965).

136.   Because she has not established a breach, Ervin necessarily has not shown any injury caused by a breach.  Regardless, in the interest of completeness, the Court makes the following observations regarding causation.

137.   Dr. Schocket opined, and the Court is persuaded, that there are no known physiological effects of a properly treated contrast reaction.  Dr. Konstance also admitted that he was not aware of any lasting physical effects of a properly treated reaction.  Ervin concedes that her hypotension was properly treated, and she has not argued that the reaction itself caused any lasting physical injury to her.  She has thus not established any physical injury caused by the asserted breach of the standard of care.

138.   The main injury Ervin claims to have suffered from the events of

November 14, 2016, is PTSD.  Even if the Court had concluded that Ervin established a breach of the standard of care by Dr. Greyson, the Court is not persuaded that Ervin's PTSD was caused by any such breach, for at least two reasons.

139.    First, Ervin has not presented evidence sufficient for the Court to conclude by a preponderance of the evidence that, had she been premedicated as Dr. Konstance claims was necessary, her hypotension would not have occurred.  All of the experts agreed that steroids do not prevent all reactions.  Trial Tr. at 132:8–15, 436:6–13, 602:22–603:20, 662:4–663:4.  Drs. Holland and Schocket both testified that it is not possible to state with scientific certainty that she would not have had the reaction had she been pretreated with steroids.  Trial Tr. at 603:15–20, 662:24–663:4.  And while Dr. Konstance asserted that he did not believe Ervin would have suffered the reaction had she been given steroids, Trial Tr. at 409:19–410:14, this is just rank speculation, as neither his report nor his testimony references any scientific evidence supporting this assertion.  Ervin did question several witnesses regarding statistics purporting to show that steroid premedication reduces the likelihood of recurrent reactions by 30%, *e.g.,* Trial Ex. 39 at 12, but that figure appears to come from studies of individuals at high risk of recurrent reactions, which is to say those with a history of severe contrast reactions. Trial Tr. at 677:3–25.  Because Ervin was not properly considered at high risk before her November procedure, the Court is not persuaded that the 30% figure accurately reflects the reduction in risk she claims would have occurred.  She has therefore failed to carry her burden on scientific causation.

140.    Second, the evidence supports the conclusion that most of the specific

alleged traumatic occurrences that Ervin testified caused her PTSD did not actually occur.  She testified that she heard voices saying things like, "We're losing her!" during the catheterization procedure, but every percipient witness testified that the atmosphere in the room was focused, quiet, and professional, and no such exclamation was made by anyone.  She testified that a distraught nurse physically comforted her during the procedure, but then became so agitated at what was happening that she had to be ordered out of the room.  According to the overwhelming weight of the evidence that, too, simply did not occur.

141.    Ervin did testify that the calling of the code blue and the placement of a jugular catheter caused her distress, and these events did occur.  Trial Tr. at 313:3–12, 330:18–20.  But neither she nor her expert psychologist made any attempt to separate out the imagined traumatic events from the actual events and establish that she would have developed PTSD even if she had not imagined the more extreme occurrences.  Without Ervin making even an attempt to do so, the Court cannot conclude that the code blue and jugular catheter, standing alone, were sufficient to have caused Ervin to develop PTSD.

142.    To be clear, it is not surprising that Ervin's memory of the procedure differs from what actually occurred.  During the catheterization, Ervin was administered Versed and Fentanyl, medications that even Ervin's own expert agreed significantly affect patients' memory and perception of events.  These medications can cause patients to remember events entirely differently from how they actually occurred.  But every percipient witness to the events in the catheterization lab testified that Ervin was

calm and showed no sign of distress throughout the procedure, and the contemporaneous Ramsey scale notations from Panagos document this.

143.    The Court is more troubled, however, by the records demonstrating Ervin's (perhaps unintentional) exaggerations regarding the November incident to later medical providers, including reporting that she received CPR and chest compressions, and that these non-existent procedures resulted in her breaking a rib.  Ervin denied making these statements during her testimony, but she could offer no convincing explanation for why these very specific statements were recorded in her 2017 medical records.  The Court concludes that Ervin exaggerated the events of the catheterization to the 2017 providers but denied under oath having done so.  Unfortunately for Ervin this brings the credibility of at least some of her trial testimony into serious question.

144.    Because most of the traumatic events Ervin claims caused her to develop PTSD did not happen, the Court easily concludes that no putative breach of the standard of care by Dr. Greyson caused Ervin to develop PTSD.

**D.  Damages**

145.    Colorado law caps Ervin's potential damages.  Colo. Rev. Stat. § 13–64–302 provides that the total amount recoverable in a medical malpractice action "shall not exceed" $1,000,000, of which "not more than" $300,000 shall be attributable to noneconomic injury.  *See* Colo. Rev. Stat. §§ 13-64-302(1)(a)–(c).

146.    In addition, under the FTCA, a plaintiff may not recover more than they claim in their initial administrative claim—presented on form SF-95—to the agency.  28 U.S.C. § 2675(b).  The United States is not subject to punitive damages under the

FTCA.  *See* 28 U.S.C. § 2674.

147.    Ervin did not establish breach or causation, as discussed above, and so her evidence of damages is irrelevant, and she may not recover any damages at all. Nonetheless, the Court provides the below observations regarding damages.

148.    Ervin's SF-95 sought $5,000,000 in damages, which exceeds the relevant Colorado damages cap.  The Court is thus limited by the Colorado statute to awarding a maximum of $1,000,000, of which not more than $300,000 may be awarded for noneconomic damages.

149.    The only economic damages Ervin presented evidence of was the $22,000.80 cost of her overnight stay in the Intensive Care Unit after her November 14, 2016, cardiac catheterization.  ECF No. 75.

150.    Because Ervin presented no other economic damages attributable to the alleged negligence, the Court could award no more than $22,000.80 as economic damages, had Ervin proven the other elements of her negligence claim.

151.    Under Colorado law, non-economic damages generally include pain and suffering, inconvenience, impairment of quality of life, and emotional distress.  Colo. Rev. Stat. § 13–64–302(1)(a)(II)(A).

152.    Ervin testified that she suffered emotional distress, PTSD, and impairment of her quality of life due to the events of November 14, 2016.  However, as discussed above, she did not show by a preponderance of the evidence that any of those damages were caused by a breach of the standard of care by Dr. Greyson.  She is thus not entitled to non-economic damages.  The Court makes no comment at this time on

what hypothetical non-economic damages it would award had Ervin proved her cause of action against the United States.

### III. RULE 52(C) MOTIONS

153.    Federal Rule of Civil Procedure 52(c) provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party."  Fed. R. Civ. P. 52(c). Judgment under Rule 52(c) must be supported by findings of fact and conclusions of law as required by Rule 52(a).  *Id.*

154.    At the close of the Ervin's case, the United States made an oral motion pursuant to Rule 52(c) ("Rule 52(c) Motion").  Trial Tr. at 453:10–15.  The Court took the United States' Rule 52(c) Motion under advisement.  Trial Tr. 462:24–463:3.  The United States renewed its Rule 52(c) Motion at the close of evidence.  Trial Tr. at 240:6–10.  The Court also took the United States' renewed Rule 52(c) Motion under advisement.  Trial Tr. at 752:22–5.

155.    The United States' Rule 52(c) Motion is denied as moot, consistent with the foregoing findings of fact and conclusions of law entered after a full trial on the merits to the Court.

### IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.    The United States' Rule 52(c) Motion is DENIED AS MOOT as set forth above;

2.    The Court FINDS and CONCLUDES that Dr. Clifford Greyson's care of

Plaintiff Lawanda Ervin met the applicable medical standard of care, and that he did not breach any duty of care owed to Ervin;

3.    The Court FINDS and CONCLUDES that, even if Dr. Greyson had breached a duty owed to Ervin, she did not show by a preponderance of the evidence that that putative breach caused her any injuries;

4.    The Court FINDS and CONCLUDES that Defendant United States is entitled to judgment in its favor on Ervin's medical negligence claim against it;

5.    The Court ORDERS that the parties shall bear their own attorneys' and experts' fees, and court costs; and

6.    The Clerk shall enter final judgment and terminate this action.

Dated this 12th day of April, 2024.

BY THE COURT:

William J. Martinez
Senior United States District Judge